It seems like a pretty orderly group to begin with at this point. We will now proceed to the third case of the morning, Dollard v. Whisenand. Mr. McQuarrie. Thank you, Your Honor. May it please this Court, my name is Jeff McQuarrie and with Mr. Fisher, I represent the plaintiff doctors and employees of the Doran Medical Practice. The district court committed reversible error by holding that exculpatory evidence known to the officer at the time of the arrest can be excluded from a probable cause analysis. The district court held that where a doctor is accused of dealing in a controlled substance in the form of selling prescriptions, that evidence that the doctor wrote that prescription with a legitimate medical purpose and in the ordinary course of his medical practice, that this evidence is an affirmative defense that it has bearing only at the guilt phase of criminal proceedings and has no bearing on whether the doctor was arrested without probable cause in the first place. Gosh, forgive me. I must say, well, you argue that you've argued that Judge Young improperly construed the evidence bearing on probable cause. Yes, Your Honor. But as I understand it, you don't dispute most of the evidence laid out in Agent Wisenhan's affidavit. So I'm not sure what facts there were to construe in one party's favor or the other. I mean, either the evidence established probable cause or it didn't. And either there were falsehoods or material omissions in Agent Wisenhan's affidavit or there weren't. It seems to me, okay, that you want to argue guilt or innocence rather than probable cause. Your Honor, first of all, there were material misstatements and omissions in the probable cause affidavit. The lead investigator completely misstated the applicable regulation that covers when a doctor needs to examine a patient in order to prescribe medication. And eliminating, in his explanation to the reviewing magistrate, exceptions that covered the conduct for which the doctors and employees were arrested. There were also misstatements. Never, basically almost never, examining patients? That is untrue, Your Honor. First of all, the patient is always examined thoroughly at the commencement of treatment. That's not what the evidence said. That wasn't the experience of the undercover agents, was it? The undercover agents may have characterized this examination as an interview or a lecture, but they were physically examined, or excuse me, not physically, but they were questioned by Dr. Lay about their medical histories. The expert witnesses even admitted at the trial of Larry Lay that they, too, would not necessarily conduct a physical examination of a patient in an addiction clinic because addiction is a psychosocial condition. I thought these folks were being treated for pain. They were not being treated for pain, Your Honor. They were being treated for addiction. In some cases, the addiction is a result of pain medication. I realize the two will often go together, but I thought a lot, at least Agent Wisnund reported that prescriptions were being written for pain management. In cases where the prescriptions were written for what was described as pain management, which avoids the 100 patient per doctor limit, right? It did, which incidentally has now been raised to 275 per doctor. But regardless, that simply was a distinction about how the patient came to be an addict. Some addicts, some addictions were iatrogenic, meaning that they arose in the course of medical treatment. Others became addicts through use of street drugs. The relevance to whether a patient was addicted through street drugs or pain treatment chiefly came from the fact that an addict who was undergoing pain treatment may be on medication for the rest of his life. But to return to Judge Rovner's question, the probable cause affidavit contained no exculpatory evidence whatsoever. Under the Franks v. Delaware standard, the district court was required to consider the material omissions that Gary Wisenhand made in the probable cause affidavit because he uncovered quite a bit of exculpatory evidence showing that the doctors did believe that they were treating patients with legitimate medical tools, that none of the doctors were giving out Suboxone for patients to sell or to get high, Look, patients didn't even have to present identification at these briefings. Your Honor, there's no need for a patient to present identification in order to get a script because the patient has to show identification at the pharmacy when he fills the script to get the prescription. Without an ID at the pharmacy, the script is just a worthless piece of paper. So there was no need for the doctors to police that at their office. They did not give out the Suboxone themselves. They gave the patients scripts so that they could fill them at the pharmacy. Weren't there some appointments where there was no doctor? I'm sorry, Your Honor, catch the line. Weren't there some appointments where they showed up and there was no doctor and they got a script? There were a very small number of instances where a patient received a prescription without a doctor present. This was a highly unusual situation. In most cases, they occurred where the staff bent the rules for someone who said that he was late or couldn't come in on a scheduled appointment. This was not the normal practice. The normal practice... Well, it certainly seems like, from the brief, certainly in the evidence, that in many instances, the successive prescriptions were pre-signed by a physician they didn't see, just as Judge Flom noted. And often the stated reason for the prescription changed from dependency to pain management or vice versa without any explanation whatsoever. Your Honor, I should say, first of all, it is not a crime to pre-sign prescriptions. Second, any time a patient was going to... It may not be a crime, but is it really ethical? Well, Your Honor, in this instance, the plaintiff doctors had been charged with writing prescriptions without a legitimate medical purpose. I think probable cause is concerning those facts that explain, was the medication appropriate for that patient? Was it in an appropriate dosage? Was the patient examined? And in all these cases, the answer is that they were. As the trial court noted in Larry Lay's criminal case, every patient was an appropriate patient. In other words, an addict in need of a treatment. The only medication ever prescribed to them was Suboxone, an FDA-approved medication for the treatment of drug addiction. And every prescription was written in a therapeutic dose. In fact, when the undercover agents infiltrated the practice and presented the doctors with false medical histories, they received prescriptions for the amount of medication that was appropriate for the false histories that they presented to the doctors. Did everybody get the same dose? No, Your Honor. Every patient was placed on a taper schedule. The taper schedules were similar, but where a patient appeared on that taper schedule depended on the amount of drugs he was using and the type of drugs that he was using. And patients were moved on that taper schedule to slowly reduce the amount of Suboxone they were prescribed. Do those schedules, are they documented schedules? Are they in the record? Yes, Your Honor. They were not in the probable cause affidavit. For all the charts, figures, and photographs that the government placed in the probable cause affidavit, they never put the taper schedule. Would they have had access to that? Pardon? Would the investigators have had access to that? Absolutely. Yes, absolutely. This was known along with the pledge whereby the patient signs a pledge saying that he will not use street drugs, he will not use opiates prescribed by another physician without telling the Dorn Clinic that he will obtain counseling. This was all known to the investigator and left out. Similarly, the… Sorry, how does the investigator know the taper schedules? Because this is given to the patient at the time on the first day of treatment, and the undercovers each received the taper schedule. They each received the pledge. I think another fact that was left out of the probable cause affidavit that is of critical importance is that the Dorn doctors routinely dismissed patients who failed to comply with Dorn's requirements, such as not taking street drugs and attending counseling. Patients were routinely subjected to urinary drug screens, and if they failed the drug screens, they could be dismissed from the program, and indeed many were dismissed from the program. Although the probable cause affidavit does acknowledge that two of the undercovers were dismissed from the program for either refusing a drug screen or taking one and no suboxone showing up, leading the doctors to suspect that they were selling it rather than using it. Although these are briefly mentioned, nowhere in the probable cause affidavit does it say this was a policy of Dorn, that this was a regular practice, not just unique incidents that happened to those two investigators, but that the doctors routinely dismissed patients who refused to comply with the program, and there is a critical reason that that was left out, because if you acknowledge that patients are dismissed for failing to comply with the program, then you have to admit there is a medical program. They are receiving ample medical treatment. They are being closely monitored, and if the patient fails to live up to the doctor's expectations, they will be dismissed. Judge Romer, you may ask a question, of course. I'm sorry. Yes, Your Honor. You are arguing that there was real medical treatment here, medical examinations. Absolutely. Absolutely, Judge. There was legitimate medical treatment. Dorn's patients were helped. The expert witnesses acknowledged, for example, that even in their own practice, they would not typically conduct a physical examination of someone claiming to be a drug addict, because drug addiction is a psychosocial condition that is determined by observing behavior over time, not something that you can test by doing a blood draw or something like that. The government's own experts say that they do determine addiction by conducting a mental status exam, which is mostly looking at the patient and talking with him and not touching the hammer to the knee and seeing if he gets a reaction. So if I could just follow up on one thing. So let's take, for example, I'm looking at paragraph 104 of the affidavit, which is about undercover agents Holbrook and Schmidt. Yes, Your Honor. To follow up on Judge Rovner's point, they received suboxone prescriptions for chronic pain pain management, not for addiction treatment, but chronic pain pain management without what looks to me like at least a physical exam, right? Your Honor, a physical exam would not have been conducted. For pain management? But Dorn did not provide pain management. It treated individuals. That's what it's prescribing for. What am I missing here? Because all patients at Dorn were drug addicts, and that is what they were being treated for. Dorn was not a pain management clinic. Dorn physicians sometimes referred their patients for pain management elsewhere, but the prescription for suboxone was to treat the addiction. So a quote from the PCA, at the conclusion of the approximate two-hour visit, both undercover officers received suboxone prescriptions for, quote, chronic pain slash pain management, close quote, in exchange for $300 cash. Is that false? It is not false, Your Honor. Well, yes, it is false. What's false about it? It is false in that they did not receive the prescription for $300. They received the prescription as part of their treatment. The treatment for $300 that included no physical examination, correct? Correct. And with a prescription for chronic pain and pain management. Is that part correct?  Thank you. If I may give one explanation, Your Honor. You can just conclude with this final remark. Yes, sir. Under some circumstances, the Dorn physicians did treat for pain that is incident to the heightened sensitivity to pain that opioid addiction causes. Opiate addicts have a lower threshold of pain because the addiction lowers that threshold of pain. That is the one aspect of pain that suboxone treats. All right. Thank you, Mr. McCurry. Thank you. Mr. Fisher. Your Honor, I want to address the pain issue because I think the court does not understand the way that this clinic operated. This is an addiction detoxification clinic. That is all that it does. It takes addicts. It gets them off their addiction to opioids. They do, in fact, treat pain, but only one very specific type of pain. They treat a pain called opioid hyperalgesia. It is a perverse side effect or symptom of opioid addiction that while you start out taking painkillers, once you get addicted, the painkillers themselves produce pain. That is one of the reasons why you can't be on OxyContin for pain forever. Because in many patients, the result of that will be you will have pain coming from your addiction to the opioid. The only test to determine whether you are suffering from opioid hyperalgesia that is a heightened sensitivity to pain caused by your addiction is to reduce your addiction. And that's why this clinic does it. If it identifies a patient with pain that they suspect is pain produced by their addiction, the treatment of that or the diagnosis of that comes from reducing their level of opioid dependency by the treatment for their addiction. And the treatment and cure of that condition is eliminating the opioid dependency. So it fits in with what they're already doing. They're a detoxification center, and if you have opioid hyperalgesia, it will treat that pain. But that's all. They do not treat chronic pain. If you come into their clinic, you're not an opioid addict. You say, My back's been hurting forever. You're referred to a pain clinic. They don't treat you. They don't treat pain. They treat addiction. They do, in fact, write prescriptions for pain secondary to addiction, but not for pain management as the sole diagnosis. Are those statements in the probable cause affidavit false? No, and they should be. That's one of the reasons why we filed this lawsuit is because had the judge known that when he was reviewing the probable cause affidavit, he may well have not found probable cause. You didn't let me complete my question. The question was, Are these statements about what the prescriptions were for to the undercover agents true or false? I believe they're false. Why? I believe the prescription themselves say pain, pain management, secondary to opiate addiction. Do we have those in the record? Yes, I believe they are in the record. The prescriptions are in the individual undercover officers' materials that are in the record. Where do we find them? I can't give you the exhibit numbers, but the packets, including the prescriptions, were all placed into the record, I believe, Your Honor. Was there any indication on the prescriptions that they were treating this opioid hyperalgesia? I don't think the term opioid hyperalgesia appears. What does appear is pain secondary to opioid addiction. And, of course, that's quite different than pain secondary to an old back injury or pain secondary to something else. It's the addiction itself, which is what they're treating, that is the source of the suspected pain. And, Your Honor, I would agree with you that by taking advantage or using this diagnosis of pain secondary to addiction, maybe that was a means of getting around the 100 limit. But that isn't a crime if it was done. These are patients who had a problem, who had pain, and who had addiction, who are going to a clinic that would treat their addiction, that would get them off of the medication, off of the opioids, and in many cases, if not most cases, eliminate or reduce the chronic pain condition. Once the patient is no longer addicted, they're referred out. We don't treat pain at DORN. DORN treats addiction. That's what it's for. Judge Rosner, you suggested that we did not dispute much of the evidence in the affidavit. I couldn't disagree more. I think the affidavit contains almost nothing that is true, that isn't spun to make it appear to be more favorable to the prosecution. The first 41 pages and 103 counts of the probable cause affidavit are admitted by Mr. Wisenhand to be irrelevant and to not be the basis of the charges that were filed. It's filled with false hearsay. It's filled with accusations that were never true. It's even got quotes from Internet trolls who have anonymously posted derogatory information on the Internet. We disagree with almost everything in there. We disagree that there was no medical examination. Understand the structure of this. In order to get a prescription, you had to be admitted to the program. You had to appear before Dr. Lay, who is a certified expert on addiction, for a two-hour interview. You had to fill out a seven-page long questionnaire concerning details of your history of drug use, both legal and illegal. Part of the two hours was spent in explaining the program and explaining addiction, but an hour of it was spent in questioning the witness or questioning the patients about their history of drug use. That's how you diagnose addiction, is you find out the history of drug use. How many of these patients would be in one of these sessions? At most three. So if you're spending one hour questioning three people about their history of drug use, you're spending a pretty fair amount of time questioning and interacting with each one on what they're taking, how long they've been taking them, why they're taking them. You simply can't spend an hour saying how many drugs you've taken today and what did you take and then stop. That's the spin that was attempted by the undercover agents. But the probable cause is to be determined on a summary judgment motion by the evidence most favorable to the non-moving party, not by the spin most favorable to prosecution placed on it by an undercover agent. All of the UCs admitted that they were required to attend a two-hour session with the doctor after filling out this detailed history of drug use before they would be admitted to the program and given a personalized, tailored program to substitute the safe Suboxone for the very unsafe drugs they were taking and a taper schedule to get them off of it. So you would have, for instance, three people being questioned at the same time by Dr. Lay? Right. Dr. Lay's got their questionnaire. Is that like my going to an internist and he had two other patients in the room with me questioning each of us? Well, it depends on what you're there for, but that would typically not take place if you were going there for a diagnosis of some physical illness. But for a diagnosis of are you or are you not an addict, that's perfectly acceptable. It is. I see. Could I briefly ask you, Mr. Fisher, you all have emphasized that the probable cause affidavit deleted some key exceptions from the regulation concerning prescriptions. Yes, sir. It looks like, maybe I'm wrong, but the principal omission from your point of view was the so-called cross-coverage reference. Yes. My question is how important is that actually given just the focus on Dr. Lay and his practices here? As for Dr. Lay, as for his case, it's not important at all. What it's important to are the three clinic doctors, because those three clinic doctors are entitled by the Indiana regulations to rely upon the diagnosis of the patient made by Dr. Lay. These clinic visits aren't visits for a new patient to get a prescription. These are limited to compliance testing to make sure that the patients who have been put on the program are complying with the rules of the program. The only purpose of seeing them is so that you don't give medication for more than 30 days. You make them come back and be seen by a doctor. Now, the regulations require you to see the patient only once every four months. At Dorn, they saw them every month. You have an opportunity to ask questions of the doctor. You have an opportunity to indicate any issues or problems you're having. Each patient, each undercover agent, affirmatively stated, I'm having no issues, I have no questions, and I don't want to see a doctor. That's the reason these clinic visits were short. Mr. Fisher, I want to ask you a question. My notes suggest that Dr. King testified that it was unrealistic for a physician to treat 80 to 100 patients in a three-hour period. Where does that 80 to 100 come from? What the undercover agents did is they sat outside and counted the number of people who walked into the clinic. They counted the patient, the patient's brother, the patient's father, the patient's wife, the patient's anybody who walked in. So you think that the population is just undetermined based on the count? You could have gotten a count by looking to see how many prescriptions were filled in a given month because everybody at Dorn, every patient had to come back and get only a month's worth of prescriptions. None of the doctors exceeded the 100 limit that's established by the DEA for the number of patients that you're permitted to treat in this program. For addiction? For anything. None of the clinic doctors exceeded 100, counting both pain and addiction. The only one who did exceed that number was Dr. Lay. Dr. Lay exceeded that number because he wrote the initial prescription for every patient at Dorn because they all had to come see and be examined by him before they'd be admitted. So with respect to my client, Dr. Agapios, for example, he never treated more than 100 patients at a time. Can I go back to this issue of opioid hyperalgesia? A new phrase for me, but if a patient is complaining of pain, how does a doctor differentiate that as the cause of pain from other physical sources of pain? You reduce the opioid, and when the opioid reduction is accompanied by an increase in pain, then it's not opioid hyperalgesia, it's something else. If the reduction in the opioid that you're taking reduces the pain, that shouldn't happen if the pain is some underlying condition. That is the diagnostic or differential diagnosis. What happens when we start to taper? As opposed to some kind of physical exam? Yeah, you ask the patient if their pain is better. There is no physical, there is no objective physical test for pain. You simply rely upon the history being given by the patient. If the patient says they experience reduction in pain with the reduction in the opioid, then what you're dealing with is opioid-induced hyperalgesia. Thank you. All right, thank you, Mr. Fisher. Ms. Woods. Good morning. My name is Shalise Woods, and I represent Gary Wisenhand in the United States of America. I'd like to address the probable cause arguments that the appellants have made, and then, if I have time, briefly, qualified immunity, which the appellants did not raise in their opening brief. First of all, there is nothing in the probable cause affidavit that is false. The plaintiffs have never established in the district court or now on appeal that there is a false statement of fact in the probable cause affidavit. Judge Hamilton had a question about the exact language of the prescription. I can't point to the actual prescription in the record, but if you look at paragraph 126 of the probable cause affidavit, it does refer to one of the secondary opiate dependency pain diagnoses that are written on one of the prescriptions for the undercover. So we would posit that the quotes by Mr. Wisenhand in the probable cause affidavit about the prescriptions are true. Today is the first time I've heard the argument that they are not. They are correct and are verbatim what is in the prescription. In fact, the entire probable cause affidavit is based on largely the undercover videos of these undercover visits. And if you track the probable cause affidavit side by side with those undercover videos, it just lays out exactly what you see on that video. It's undisputed. And Mr. Wisenhand did include information in the probable cause affidavit about those visits that counsel today say was not included. For example, he included the fact that one or two of the undercovers were dismissed from the program for refusing to take the drug screens. They admit that that is true and it's in there. And it's not favorable to the state's case. There was also a question about the number, I think from Judge Flom, the number of prescriptions being written and where did Dr. King get this information. In the probable cause affidavit, Mr. Wisenhand reviewed and relied on InSpec reports. This is a database maintained by the state of Indiana about the number of prescriptions for controlled substances being written in a year. If you look at, for example, paragraph 38 of the probable cause affidavit, it sets out the number of prescriptions for Suboxone being written under Dr. Larry Lay's number, and it establishes that there were 20, 25, and 24 days in a year where well over 100 prescriptions were being written. 252 was one day, 185 was another day. Assuming Dr. Lay worked an eight-hour day, which he admitted in his deposition that he did not,  he would have had to have written one prescription every 1.9 minutes. And so Dr. King's opinions about the number of patients being seen was informed by surveillance at the clinics about patients going in and out and carrying a piece of paper in their hands, also witness statements about the number of patients being seen, and also this InSpec data. And so getting to probable cause, the district court engaged in the proper probable cause analysis for a Fourth Amendment case. The judge looked at the probable cause affidavit, and he determined based on the evidence in that affidavit, none of which was established to be false, was there a probable cause to believe that these doctors and the employees in these clinics might be engaging in dealing under the Indiana statute. And, in fact, the evidence overwhelmingly supported probable cause. As the court has pointed out, patients were able to walk into a clinic and within about a minute to a minute and a half sometimes walk out of there with a prescription in exchange for cash. The clinics only accepted cash. They did not accept insurance. The patients, in many cases, never saw a doctor, and they weren't even asked to provide identification. Did all the patients see Dr. Lay initially? Yes. Based on the evidence as we know it, all of the patients were required. Okay. Yes. I mean, I get prescriptions refilled without seeing a doctor all the time, right, after I've seen a doctor. So the issue is in this case, did, based on the observations that the DEA made and then the state ultimately, did at any point in time these patients receive any sort of medical diagnosis or actual treatment? And as you pointed out, Judge Hamilton, many of these patients were written prescriptions for pain or chronic pain when there was no actual diagnosis of that made. In fact, what happened. Ms. Woods, could I ask you a couple of other questions? Yes. I'm trying to think of a case in which I've seen a federal agent provide this kind of detailed probable cause affidavit for a state or local prosecution. How common is that? I would say quite common. And, Judge, that's because this was a case that was initially being run through the U.S. Attorney's Office. Mr. Wisenhand was working with an assistant United States attorney, obtained a court order for the undercover investigations. Ultimately, the U.S. Attorney's Office declined prosecution. I mean, I would say that Mr. Wisenhand would have submitted such a detailed affidavit, even if it had only been a state case from the beginning, because they were charging four doctors with dealing, which was not unprecedented by any stretch, but is unfortunately becoming more common. Let me raise, if I could, a couple of concerns about the affidavit. One is the misquotation of the relevant regulations, which troubles me. I'd like you to address that if you could. And also, maybe a more fundamental problem, I think I understand at least the general contours of the case that was being laid out regarding Dr. Lay and the other doctors. The clerical staff, I don't see much probable cause regarding the non-medical folks. If a doctor is telling, write this prescription, issue this prescription, why isn't that perfectly legal? Your Honor, I'll start with the citation to the Indiana Administrative Code. First of all, if you go back to Franks v. Delaware, the Supreme Court held that the warrant affidavit cannot contain a false statement of fact,  I am not aware of a case, and I looked, where a court has held that any sort of misstatement of law to a judge is a misstatement of fact that would invalidate probable cause. And keep in mind that the quote that Mr. Wisenhand included is correct. It does omit introductory language in the application. Critical exceptions, right? So then I think, and going back to Supreme Court precedent, in 1997 in Lambricks v. Singletary, the court said that a determination of whether facts supporting a finding of probable cause is committed to the judge who is presumed to know the law and to apply it in making his decision. So I think what the plaintiffs are asking for here is a finding that a DEA investigator... So a state court judge who gets this kind of, one would expect, highly professional probable cause affidavit from a federal agent is supposed to site check his legal references? Yes, Your Honor. Is that your proposition? Well, he is tasked with knowing what Indiana law is. Yes. That's an extraordinary defense of this omission. So let me offer a second argument. That might be a good idea. The question would be, did Mr. Wisenhand knowingly or recklessly withhold critical information from this judge that he knew would negate probable cause? The doctors, Dr. Lay in his criminal trial argued this, what we call a cross-coverage defense. That is that this initial examination, I'm using that term loosely, this meeting with him in a conference room could be imputed to the other doctors that they were allowed to rely on that and then write prescriptions for controlled substances later, sometimes even a year later, without ever seeing that patient. There would have to be evidence that Mr. Wisenhand knew that this is the defense that the doctors were going to raise, that there was evidence supporting this defense, and he withheld that evidence from the court. There are no facts establishing that at all. You know, the appellants have tried to say in this case, based on statements in Mr. Wisenhand's deposition, that he knew all along that they were providing legitimate medical services. That is not true. He confirmed in response to multiple questions, what did you believe, what did you not believe, that he believed that they were committing a crime. Could you address specifically, I think it's the excerpt that is relied upon in plaintiff's reply brief from pages 174 and 75 of his deposition. I think it's in volume two of the appendix. There's a series of questions about the doctor's beliefs. Yes, sorry, Judge. In their reply brief, they say, Wisenhand admitted that all the doctors likely believed that they were providing appropriate medical care. That is not what Mr. Wisenhand said. If you go to those pages in his deposition, he was asked, and that's the reason they were prescribing Suboxone, is as a tool to help these people presenting as addicts to get off their addiction. He responded, that's what it's used for. And they asked him, and that's what the doctors believe they were doing, isn't it? And he said, I can't say exactly what the doctors were believing, but I would say that's what they were there for, meaning the patients. And look, that whole pain versus addict issue only lends credence to probable cause, right? Because it was never the state's theory that every patient walking into a Dorn clinic was just there to get a prescription and then sell it in the parking lot. That was not the state's theory. In fact, Mr. Wisenhand and the state believe that many of these patients were seeking legitimate treatment for an opioid addiction, but they weren't getting it. That's the problem. They were getting, you know, handed a prescription in exchange for cash. I think my time is up. Could you address the non-medical employees? Oh, yes, Judge, sorry. So if you look at the facts of the probable cause affidavit and also these undercover videos, you would see that what you deem the clerical employees were mainly office managers, meaning they were running the office. They were printing off prescriptions, handing them to the patients. Sometimes they were the only employee that the patient ever saw. The Indiana Court of Appeals held in YM versus state, the YM being Yvonne Morgan, one of the plaintiffs in this case, that there was probable cause to find that a non-physician could engage in this type of criminal conduct if they knew or should have known that what they were doing was wrong and that that was an issue for the jury. And so while the appellants have tried to deem the non-medical employees as having very little involvement, in fact, they were the central, in many cases, they were running the office. They were the only person with whom a patient ever had an interaction. Ms. Woods, I think that argument that you present seems to cover everybody inside. The one individual that I have a little pause with is Mr. Mackey, the parking lot attendant in, I think, Kokomo. I know you suggest a pretty big umbrella here, but I'm a little bit at a loss to see where Mr. Mackey would fit in under the probable cause. Again, Your Honor, we would point you to the probable cause affidavit and the undercover visits. The plaintiffs have called Mr. Mackey the parking lot attendant. He was hired initially to control the traffic and to make sure no violent acts or drug deals were going on in the parking lots. He took on a larger role later. He was bringing patients in. He was involved in, you're correct, the Kokomo office. His involvement became more extensive as time went on. And keep in mind, too, Mr. Wisenhan drafted the probable cause affidavit and the facts in it. He had that affidavit reviewed by both prosecutors. Andre Miksha, the Hamilton County prosecutor, testified in his deposition that he made the decision to charge Joe Mackey, and he asked Mr. Wisenhan to go back and include additional facts related to Mr. Mackey. And those facts are true. They match up with the undercover videos. So that was a decision made by the prosecutor, ultimately, to bring those charges. Thank you. Thank you. And one additional comment. I would also ask that you affirm on the basis of qualified immunity for Mr. Wisenhan. Thank you. Mr. Fisher. I mean, Mr. Stephenson. Excuse me. Good morning. May it please the Court. James Stephenson for Aaron Dietz and the City of Carmel. Your Honors, the district court reached its ruling based on probable cause. However, there were other grounds supporting summary judgment for my client, Mr. Dietz, all of which were fully briefed in the district court, so the plaintiffs had an opportunity to respond to them. As this court knows, the court may affirm on any basis supported by the record. In this case, we have a claim under the warrant clause. That's what the claim is. Therefore, what do we look to? We look to the probable cause affidavit and who composed it and who had a role in composing it. The evidence here, which is not in dispute, is that my client had no role in drafting the probable cause affidavit. He did not even review it until it had been tendered to the state courts. He had no knowledge as to its content, and therefore could have had no knowledge as to any alleged material omission or alleged false fact. So by definition, it seems to me, he cannot be guilty of violating the warrant clause. Mr. Dietz was the fellow who drew the Pablo Escobar comparison at the press conference? He did, Your Honor. It was a press conference after the arrests were effected. It was a question from a media source. It was a rather untoward comment. I'll concede that. But he did say that in response to a question. He was the head of the task force, right? He was the head of the Hamilton-Boone County Drug Task Force, yes. So what facts did the court consider in determining probable cause? I'm talking about the trial court now, the state trial courts. There were orders issued based solely on the probable cause affidavit. There was no other evidence. There was no testimony from my client. He had no role whatsoever in securing these arrest warrants, at least by way of providing evidence. He had no knowledge as to the content of the affidavit. It's not enough to simply say, well, he was the director of a drug task force and received periodic updates from his investigator. That's not a violation of the Constitution. He had no role in the undercover operation, and neither did the Carmel Police Department. He did nothing to initiate this prosecution by way of  So that being the case, the plaintiffs offered nothing in their principled brief, in my opinion, implicating my client. They offered no argument. They offered no facts. On reply, they then come forward with a bunch of facts, which they did not include, which, in my view, is not appropriate appellate practice. It deprived me of the opportunity to respond to those facts. Those facts, by and large, deal with purported assertions that the drug task force would receive some type of economic windfall by way of forfeiture proceedings. The forfeiture proceedings were conducted by the U.S. Attorney and the DEA. The fact that the drug task force received money from forfeiture, which in this case was by way of a settlement, by the way, the state court, Judd Nation and the Hamilton Superior Court, issued forfeiture orders and ordered forfeiture to the DEA, and then there was this private settlement between Dr. Lay and the DEA. Sorry, at the risk of sounding naive about this, Judge Nation acquitted Dr. Lay, correct? Yes, but he's also the jury. And signed forfeiture orders? Can you explain this to me?  There are orders in the record, Your Honor, from Judge Nation on application from the DEA ordering forfeitures. Now, apparently those forfeitures were never— Those were preliminary forfeitures? Yes. Okay, and then there was a later settlement? There was a later settlement between the U.S. Attorney's Office and Dr. Lay. Dr. Lay was the only target, by the way, for forfeiture. If you look in the probable cause affidavit, there's some financial investigation which was sought by the DEA. In any event, my point is that this argument about motive has nothing— to me, it has nothing to do with probable cause or an objective test, obviously. Moreover, I request the court consider that argument waived. It was not raised in the principle brief, and I did not have a chance to respond to it. And if I did, I would be able at least to supply the court evidence to the effect that the forfeiture wasn't even within the mind of Aaron Dietz, nor was it a motive for prosecution at any level. Now, let me, if I may, talk about qualified immunity briefly. Qualified immunity is the plaintiff's burden, is it not? They are required to come forward in their brief with cases on reasonably analogous facts, which show that in this instance, an officer who had no role in preparing a probable cause affidavit, didn't know its content, didn't even see it until after it was tendered to the court, somehow is not entitled to qualified immunity. There is no case from this court or from the Supreme Court that so holds. Therefore, my client is entitled to qualified immunity, and the plaintiffs have failed not only to come forward with cases, but they don't even argue it. Mr. Stephenson, can I ask you about the district judge's reliance on this theory that usual medical practice is an affirmative defense in these cases? Yes. That's fairly troubling. Well, that's what that Alarcon v. State holds. The logic of that, if I understand it, is that any doctor who prescribes opiates, opiate painkillers in his or her ordinary practice, for that doctor there would be probable cause to arrest and search for evidence and let the doctor explain the defense to the jury. Is that right? I don't think so. Tell me why not. The prescription has to be invalid under Indiana statute to begin with. Let me just discuss the Alarcon. I'm going to answer your question as best I can, but let's start with Alarcon v. State. In that case, a doctor, under circumstances kind of like here, is arrested. Cash only business, what have you. He's arrested and asserts, well, I have an absolute defense by virtue of the fact that I can write a prescription. Court of Appeals says, no, you don't. It's not absolute. It's qualified. It's a qualified defense. So it's couched in terms of a defense, Your Honor, in that case. That's where I think the district court has concluded that what they are offering by way of the legitimacy of their practice is a defense. Putting Alarcon aside, though, the prosecution in this case didn't simply say, well, you know, I've proven that you wrote a prescription for a controlled substance. I rest my case. They put on a lot of evidence in the trial of Dr. Lay to suggest and to try to prove that the prescriptions were invalid and even had experts who offered opinions in support. So what the district court was doing is simply saying, everything you're telling me does not defeat probable cause. It may defeat the criminal charge at trial because you've established that your business is legitimate or so you claim. I don't know if that's a satisfactory answer. Maybe not. Well, I would hope no prosecutors would start issuing warrants for arrest on the basis simply that it's up to the doctor to defend the issuance of the prescription. I agree. I don't think that occurred here, Your Honor. My time has concluded. Thank you. Thank you. Mr. Stephenson. Mr. Fisher, you have two minutes rebuttal. Your Honor, the issue here is whether these were valid prescriptions. It really boils down to that. These were prescriptions issued by a qualified, licensed doctor in the course and scope of his practice, of his medical practice. If they were issued for a valid medical reason, then they are valid prescriptions and that should eliminate any possibility of probable cause. With respect to Dr. Lay, the only question raised is was his initial exam, the two hours spent with each of these patients, sufficient to diagnose them as addicts in need of treatment? If it was, then there's no probable cause for his arrest. If his examination was criminally deficient so that you could infer from the deficiency of his exam that he was acting as a pusher, not as a doctor, then there's probable cause. The evidence is that he spent two hours with each of these patients. He had them fill out detailed questionnaires. He questioned them about their drug use, about their drug history, about their feelings about their drugs, enough to diagnose them as addicts. There is no suggestion that he did anything other than diagnose addiction and treat addiction. This is an extraordinary case because the state agreed that all the treatment provided was appropriate treatment for the condition that had been presented. The prescriptions were an appropriate drug in the appropriate amount with an appropriate requirement for counseling and with an appropriate taper schedule that would result if they followed the program in the elimination of their addiction. It's a medical treatment and a medical program. But with respect to the clinic doctors, there's an additional issue that has to be shown. It has to be shown that they did not have a right to rely on the examination and diagnosis made by Dr. Lay. Sure, if somebody could walk in off the street to one of these clinics and get a prescription with no more interaction than they had, we'd agree that that would be probable cause for arrest, but that's not the Doran structure. The Doran structure is that only patient clinics or only patients of the program were allowed to come to the clinic to obtain a refill prescription. They had to have already been examined, had already passed the diagnostic and been fitted with an appropriate medical treatment. What do those doctors perform then? If Dr. Lay is the gateway, why do you have other doctors? Compliance. They're there to make sure that the rules of the program are followed. What are those rules, Mr. Frisch? Well, those rules include you will not take any other drugs and you will take this drug as prescribed. That's why urine tests were made. Do you think doctors would make that inquiry before they wrote that script? Yes, they would because the patients who came there were required on a random basis but multiple times a year to pass a urine screen. Two of the undercovers didn't get their prescriptions. They were kicked out of the program, one because they didn't pass the urine screen because they had no Suboxone in their system, the other because you tried to evade it by refusing to take it. So, yes, they were, in fact, making sure they were complying with those programs. Before the patient arrived, the doctors checked the inspect report to make sure that there were no other prescriptions for medications that they were obtaining from some other doctor. They were observed to make sure that they didn't display any unusual signs, and they were asked, do you have any issues with the medication? Do you have any questions about the program? Do you need to see or want to see a doctor? They weren't required to go to these clinics at all for medical treatment. These clinics were for compliance purposes. The rules and regulations applicable to doctors concerning programs like this is that you had to have a face-to-face meeting three times a year. You had to do a urine test once a year. DORN did more than that. They did all of these every month. Because of that, these monthly visits for compliance purposes have been twisted into making it appear as if those were the only medical treatments or medical visits provided. What was happening here is that they were making sure that the people who were getting prescriptions before they got another month's worth of prescriptions were demonstrating a commitment to the program. These prescriptions were for roughly a month at a time? Yes. Sometimes they did it for two weeks if they had an unusual concern, but a month at a time otherwise. And with respect to the staff, we've got yet another layer that needs to be added on to the burden of proving probable cause. For the staff to have committed a crime, there had to be probable cause for them to believe the prescriptions were invalid. That means they had to know what exam Dr. Lay performed to know whether it was criminally insufficient. And they had to have the medical knowledge to know that the exam he performed was or wasn't sufficient. There isn't a shred of evidence of that as to any of the clinic staff. Thank you, Mr. Fisher. Thanks to all counsel. The case is taken under advisement.